UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DALTON DUFRENE                                        CIVIL ACTION

VERSUS                                                      NO. 19-13748

HOSPITALITY ENTERPRISES, INC.                 SECTION "R" (4)
ET AL.

## ORDER AND REASONS

Before the Court is defendant New Orleans Paddlewheels, Inc.'s motion for summary judgment.[1]  Plaintiff Dalton Dufrene opposes the motion.[2]  The Court grants defendant's motion in part, dismissing plaintiff's claims under the Jones Act, general maritime law, and Louisiana law.  The Court denies defendant's motion as to plaintiff's negligence claim under § 905(b) of the Longshoremen and Harbor Workers Compensation Act, 33 U.S.C. § 901, *et seq.* ("LHWCA").

---

[1]      R. Doc. 17.
[2]      R. Doc. 27.

## I.   BACKGROUND

This case arises from injuries that Dufrene allegedly suffered while working aboard the RIVERBOAT LOUIS ARMSTRONG.   According to marketing material that plaintiff submitted with his response to defendant's motion, the LOUIS ARMSTRONG is a "music and event venue"[3] with a capacity of up to 3,000 people.[4]   The LOUIS ARMSTRONG's pilot, Paul Keller, attests in an affidavit that he began working on the vessel in 1997.[5] According to Keller, at that time, the ship was named the CITY OF EVANSVILLE, and it operated as a floating casino in Evansville, Indiana.[6] Keller states that, from 1997 to 2002, the CITY OF EVANSVILLE navigated daily on the Ohio River, as required by Indiana law for a casino.[7]   Keller attests that, in 2002, Indiana law changed such that casinos were no longer required to navigate.[8]   From that point on, the CITY OF EVANSVILLE was continuously moored to its dock, and it ceased navigation activities.[9]

New Orleans Paddlewheels, Inc. ("NOP") purchased the CITY OF EVANSVILLE on October 30, 2017, according to an affidavit by Craig Smith,

---

[3]    R. Doc. 27-14 at 1.
[4]    R. Doc. 27-11 at 1; R. Doc. 27-12 at 1.
[5]    R. Doc. 17-2 at ¶ 2.
[6]    *Id.* at ¶ 2-5.
[7]    *Id.* at 1, ¶ 5.
[8]    *Id.* at 2, ¶ 6.
[9]    *Id.* at ¶ 7.

NOP's director of marine operations.[10]   Smith attests that, after some modifications to prepare the ship for towage, the CITY OF EVANSVILLE was brought to Conrad Industries in Amelia, Louisiana.[11]   At Conrad Industries, the ship was, "completely gutted."[12]   During this time, NOP also changed the vessel's name to the RIVERBOAT LOUIS ARMSTRONG.[13]   The LOUIS ARMSTRONG was moved again in October 2018 for further renovation work.[14]   Finally, in July 2019, it was towed to the Orange Street Wharf on the east bank of the Mississippi River in New Orleans, Louisiana, where it remained continuously moored, and underwent final renovations.[15]

Plaintiff began working aboard the LOUIS ARMSTRONG on August 6, 2019.[16]   On September 10, 2019, plaintiff allegedly fell from a ladder and injured his lower back.[17]   He filed this lawsuit on November 11, 2019, alleging five claims: (1) negligence under the Jones Act, 46 U.S.C. § 30101;[18] (2) unseaworthiness under general maritime law;[19] (3) maintenance and cure

---

[10]   R. Doc. 17-3 at 1, ¶ 3.
[11]   *Id.* at 2, ¶ 6.
[12]   *Id.* at ¶ 9.
[13]   R. Doc. 17-2 at 3, ¶ 17.
[14]   R. Doc. 17-3 at 2, ¶ 10.
[15]   *Id.* at ¶¶ 12-13.
[16]   *Id.* at ¶ 14.
[17]   R. Doc. 1 at 2-3, ¶¶ 7-10.
[18]   *Id.* at 4, ¶¶ 16-17.
[19]   *Id.* at 4-5, ¶¶18-19.

under general maritime law;[20] (4) negligence under the LHWCA, 33 U.S.C. § 905(b);[21] and (5) negligence under the Louisiana Civil Code articles 2315, 2317, and 2317.1.[22]

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting

---

[20]     *Id.* at 5, ¶¶ 20-24.
[21]     *Id.* at 5-6, ¶¶ 25-27.
[22]     *Id.* at 6-7, ¶¶ 28-34.

10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by

submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

## III.  DISCUSSION

### A.   Jones Act Claim and Claims Under General Maritime Law

Plaintiff must show that he is a "seaman" to succeed on his claims under the Jones Act and general maritime law. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995). Although the term "seaman" is not defined in the Jones Act, the Supreme Court has explained that "Congress intended the term to have its established meaning under the general maritime law at the time the Jones Act was enacted." *Id.* at 355. To qualify as a seaman, an employee must show (1) that his duties contributed to the function of a vessel or the accomplishment of its mission; and (2) that he had "a connection to a vessel

in navigation (or to an identifiable group of vessels) that is substantial in terms of both its duration and its nature." *Id.* at 368. The purpose of this test is to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.*

Whether an individual is a seaman is "ordinarily a question of fact for the jury." *Ellender v. Kiva Constr. & Eng'g, Inc.*, 909 F.2d 803, 805 (5th Cir. 1990). But "summary judgment may be appropriate where 'the facts establish the lack of seaman status beyond a question as a matter of law' and no reasonable evidentiary basis exists to support a jury finding that the injured person is a seaman." *Id.* at 805-06 (quoting *Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir. 1986)); *see also Chandris*, 515 U.S. at 371 (explaining that summary judgment is warranted "where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation").

Defendant contends that Dufrene was not a seaman because the LOUIS ARMSTRONG was not a "vessel in navigation."[23] As the Fifth Circuit

---

[23]   R. Doc. 17-1 at 1.

has defined it, the term "in navigation" means "engaged" as "an instrument of commerce and transportation on navigable waters." *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955, 958 (5th Cir. 1971) (citations omitted).

### 1.    *Status of the CITY OF EVANSVILLE*

Defendant argues that the CITY OF EVANSVILLE was withdrawn from navigation in 2002, and it remained out-of-navigation for the remainder of the time that it operated as a "stationary, floating casino."[24]  In *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995), the Fifth Circuit held that the BILOXI BELLE, a "floating dockside casino" was not a vessel.  In reaching that conclusion, the Fifth Circuit rejected the application of the "classical maritime methodology for determining, on the basis of a watercraft's unique physical and functional attributes," whether a craft is a "vessel." *Id.* at 568.  Instead, it concluded that the BILOXI BELLE was not a vessel because it was both (1) "withdrawn from navigation" and (2) "a work platform." *Id.* at 570.

As the *Pavone* court explained, the "withdrawn from navigation" concept is used to distinguish "craft or structures that meet the general dictionary definition of 'vessel' from those that meet" the requirements under the Jones Act or general maritime law. *Id.* at 569.  For example, a craft

---

[24]    R. Doc. 17-2 at 3, ¶ 14.

that has been "laid up for winter" is withdrawn from navigation, and therefore not a vessel. *Id.* (citing *Desper v. Starved Rock Ferry Co.*, 342 U.S. 187, 191 (1952)).

The Fifth Circuit considered a different stationary, floating casino—the TREASURE CHEST—in *Martin v. Boyd Gaming Corp*, 374 F.3d 375 (5th Cir. 2004). Unlike the BILOXI BELLE, the TREASURE CHEST had been constructed as a cruising casino vessel and had sailed on Lake Pontchartrain for six years until the Louisiana Legislature abolished the cruising requirement for riverboat casinos. *Id.* at 376-77. The Fifth Circuit found that *Pavone* controlled. *Id.* at 376. The court held that "once the TREASURE CHEST was withdrawn from navigation so that transporting passengers, cargo[,] or equipment on navigable water was no longer an important part of the business in which the craft was engaged, the craft was not a vessel." *Id.* at 377.

In *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 496 (2005), the U.S. Supreme Court also recognized that vessels could be withdrawn from navigation—thereby losing their vessel status. It stated:

> A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that *ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day set sail again.*

*Id.* at 494 (emphasis added).  The Court cited *Pavone* with approval for the proposition—set out in a parenthetical—that a "floating casino was no longer a vessel where it 'was moored to the shore in a semi-permanent or indefinite manner.'"  *Id.* (quoting *Pavone*, 52 F.3d at 570).

Under the weight of authority, the CITY OF EVANSVILLE was not a vessel when it operated as a stationary, floating casino.  Much like the TREASURE CHEST in *Martin*, the CITY OF EVANSVILLE was "withdrawn from navigation" when "transporting passengers, cargo[,] or equipment on navigable water was no longer an important part" of its business.  374 F.3d at 377.  Defendant submitted uncontroverted evidence that the CITY OF EVANSVILLE stopped transporting passengers, cargo, or equipment in 2002, and remained permanently moored to its dock until 2017.[25]  The Court finds as a matter of law that the CITY OF EVANSVILLE was not a vessel in navigation during this period.

2.   *Status of the RIVERBOAT LOUIS ARMSTRONG*

After NOP purchased the CITY OF EVANSVILLE in October 2017, it renamed it the LOUIS ARMSTRONG and began a project—at a cost of nearly $13,000,000—of reconstructing and repurposing the ship as an

---

[25]   R. Doc. 17-4 at 2-3, ¶¶ 7-14

"entertainment and music venue."[26]  Keller attests that "from August 2002 through September 10, 2019, the [LOUIS ARMSTRONG] did not navigate on the water with passengers."[27]  The question here is whether, under these circumstances, the LOUIS ARMSTRONG regained its status as a "vessel in navigation" by the date of plaintiff's injury on September 10, 2019.

### i.    *Repairs*

In *Chandris*, 515 U.S. at 72-76, the Supreme Court discussed the "in navigation" requirement and found that repairs may "become sufficiently significant that [a] vessel can no longer be considered in navigation."  "[I]n such cases, 'the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done."  *Id.*  The "general rule" is that "vessels undergoing repairs or spending a relatively short period of time in drydock are still considered to be 'in navigation' whereas ships being transformed through 'major' overhauls or renovations are not."  *Id.* (citing Edward M. Bull III, *Seaman Status Revisited: A Practical Guide to Status Determination*, 6 U.S.F. Mar. L.J. 547, 582-84 (1994)).

---

[26]    R. Doc. 17-3 at 1, ¶ 2.

[27]    R. Doc. 17-2 at 4, ¶ 24.

In *Chandris*, the ship at issue was in drydock for six months undergoing "significant" modifications, including repairs to its bottom plates and propellers, the addition of bow thrusters, an overhaul of its engines, reconstruction of its boilers, and renovations to its interior. *Id.* at 374-75. The Court noted that "it is possible that [defendant] could be entitled to partial summary judgment or a directed verdict concerning whether the [ship] remained in navigation while in drydock." *Id.* at 375. But the district court had no stipulations or made findings as to whether the ship was "in navigation," so the Supreme Court held that the district court erred when it instructed the jury not to consider the period the ship was in the drydock. *Id.*

The Court in *Chandris* pointed to the Fifth Circuit's decision in *Wixom v. Boland Marine & Manufacturing Co.*, 614 F.2d 956 (5th Cir. 1980), as an example of repairs that may take a ship out of navigation. 515 U.S. at 375. In *Wixom*, a ship underwent "major structural changes," including the "addition of a section to the deckhouse and of a forward mast." *Wixom*, 614 F.2d at 957. During the repairs, the ship's engine and propellors were out of service for at least some of the time, the cost of the project exceeded $25,000,000, and it lasted for three years. *Id.* On these facts, the Fifth

Circuit held that the district court was entitled to conclude that the ship "was not 'in navigation' as a matter of law." *Id.*

Here, defendant's affiants, Keller and Smith, attest that the LOUIS ARMSTRONG underwent the sort of "major structural changes" that take a vessel out of navigation.[28]  *Id.*  Smith attests that NOP purchased the CITY OF EVANSVILLE for $395,000.00, and paid $12,943,135.93 to convert the ship from a floating casino into a "music and entertainment venue."[29]

According to Keller and Smith, after NOP purchased the CITY OF EVANSVILLE, it removed the ship's radar scanner, radio antennas, and smokestacks for towing to Louisiana.[30]  Keller and Smith state that the LOUIS ARMSTRONG was "completely gutted" between November 2017 and October 2018 at Conrad Industries in Amelia, Louisiana.[31]  They also state that Conrad redid the LOUIS ARMSTRONG's interior, refurbished its electrical, electronic, air conditioning, and ventilation systems, and completely reconditioned its engines, bow thrusters, propellers, and generators.[32]  Next, Keller and Smith attest that the LOUIS ARMSTRONG was towed in October 2018 to the Buck Kreihs Repair Facility in Algiers,

---

[28]     R. Doc. 17-2 at 3-5, ¶¶ 17-24; R. Doc. 17-3 at 2-3, ¶¶ 6-13.
[29]     R. Doc. 17-3 at 1-2, ¶¶ 3, 8.
[30]     R. Doc. 17-2 at 3, ¶ 17; R. Doc. 17-3 at 2, ¶ 6.
[31]     R. Doc. 17-2 at 3, ¶ 20; R. Doc. 17-3 at 2, ¶ 9.
[32]     R. Doc. 17-2 at 3, ¶ 20; R. Doc. 17-3 at 2, ¶ 9.

Louisiana, "for additional renovation work."[33]   Finally, in July 2019, the LOUIS ARMSTRONG was towed to the Orange Street Wharf in New Orleans, where it "did not at any time leave its moorings, and spent the entire time undergoing continued reconstruction work."[34]   Under these circumstances, the Court finds that the work done to the LOUIS ARMSTRONG was "sufficiently significant" as to prevent the ship from being considered a "vessel in navigation." *Chandris*, 515 U.S. at 374.

ii.    *Reentering Navigation*

Plaintiff argues that the LOUIS ARMSTRONG regained its vessel status by the date of plaintiff's injury because, he asserts, the LOUIS ARMSTRONG was *capable* of navigation as of September 10, 2019.[35]   In essence, plaintiff argues that, by the time the LOUIS ARMSTRONG reached the Orange Street Wharf, all navigation-essential equipment had been installed, and the Court should accordingly find the LOUIS ARMSTRONG to be a "vessel in navigation."[36]  Plaintiff points to Keller's deposition testimony, in which he states that the LOUIS ARMSTRONG could have "pushed up or down" the Mississippi River,[37] and the statement in Keller's affidavit that the

---

[33]    R. Doc. 17-2 at 4, ¶ 21; R. Doc. 17-3 at 2, ¶ 10.
[34]    R. Doc. 17-2 at 4, ¶ 22-23; R. Doc. 17-3 at 3, ¶¶ 13-14.
[35]    R. Doc. 27 at 5.
[36]    *Id.* at 5-12.
[37]    R. Doc. 27-1 at 18 (Keller Deposition at 95:8-9).

work being done at the Orange Street Wharf "includ[ed] cleaning and making final renovations."[38]

Plaintiff argues[39] that determination of the LOUIS ARMSTRONG's vessel status is controlled by the Supreme Court's statement in *Stewart* that "[t]he question [of vessel status] remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." 543 U.S. at 496. Plaintiff also relies on the Supreme Court's decision in *Lozman v. City of Riviera Beach*, 568 U.S. 115, 121 (2013), in which the Court held that a houseboat was not a "vessel." In *Lozman*, the Court clarified the "practicality" standard set out in *Stewart*, and stated that a structure is not a vessel "unless a reasonable observer, looking to the home's physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.*

Both *Stewart* and *Lozman* involved a determination of whether an unconventional watercraft that is engaged in its intended use on the water qualifies as a vessel. The craft at issue in *Stewart*, the SUPER SCOOP was the world's largest dredge. 543 U.S. at 484. Although the SUPER SCOOP ordinarily moved with the assistance of a tugboat, it could navigate short

---

38    R. Doc. 17-2 at 4, ¶ 26.
39    R. Doc. 27 at 4-5.

distances by manipulating a series of anchors and cables. *Id.*   In *Lozman*, the structure at issue was a "60-foot by 12-foot floating home."  568 U.S. at 118.  It had no rudder or other steering mechanism, obtained electricity by connecting to land-based outlets, and lacked a means of self-propulsion.  *Id.* at 122.  While the Supreme Court found that the SUPER SCOOP was a vessel, it found that the houseboat in *Lozman* was not.  *Stewart*, 543 U.S. at 484; *Lozman*, 568 U.S. at 118.

This case does not involve the question of whether an unconventional vessel is a "vessel in navigation."  And plaintiff has not pointed to authority in which a court has applied the *Stewart* and *Lozman* tests for vessel status to answer the question presented here: whether a ship that was withdrawn from navigation has reentered navigation.  The most analogous authority on this issue is *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295 (5th Cir. 2008), which involved a determination of when a newly constructed vessel becomes a vessel in navigation.  Because the LOUIS ARMSTRONG was essentially reconstructed to serve a new purpose, the Court finds the *Cain* analysis particularly apt.  *See McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 571 (9th Cir. 1992) (finding that a case involving a drilling rig hull that was converted to a seafood processing ship was "more analogous to new construction than repair or overhaul").

In *Cain*, the Fifth Circuit reaffirmed its longstanding precedent that an "incomplete watercraft" is not a "vessel in navigation" for purposes of the Jones Act.  518 F.3d at 303; *see also Williams*, 452 F.2d at 958 (holding that "an incompleted vessel not yet delivered by the builder is not" a vessel in navigation).  This "vessel under construction" doctrine has been recognized in other circuits, *see Caruso v. Sterling Yacht & Shipbuilders, Inc.,* 828 F.2d 14, 15-16 (11th Cir. 1987)*; Frankel v. Bethlehem-Fairfield Shipyard*, 132 F.2d 634, 635-36 (4th Cir. 1942), but it has not yet been addressed by the Supreme Court.  In *Cain*, the Fifth Circuit summarized its "established precedent" on "crafts that are under construction" as follows:

> We have long held that the Jones Act analysis requires a watercraft to be "in navigation," and we have drawn a distinction between completed crafts and crafts that are under construction. A maritime worker "assisting in the building and ultimate commissioning of a launched but uncompleted vessel floating or maneuvering in navigable waters is not a seaman within the meaning of the Jones Act, because his vessel is not yet an instrumentality of commerce—private or public—and is therefore not 'in navigation.'"

518 F.3d at 298 (quoting *Williams*, 452 F.2d at 958).

Under this precedent, the Court considered the seaman status of a worker aboard the CAJUN EXPRESS, a semi-submersible offshore drilling rig.  In March 2001, the plaintiff in *Cain* had been assigned to work on the CAJUN EXPRESS while it was under construction in Singapore. *Id.* at 296.

The CAJUN EXPRESS underwent sea trials in the first half of 2000 and then was towed from Singapore to Grande Isle, Louisiana. *Id.* at 297. After arriving in the Gulf of Mexico, the CAJUN EXPRESS was moored in a "floating shipyard" to complete construction. *Id.* At that point, the rig was "capable of self-propulsion," but it "was not fully capable of operating as a semi-submersible drilling rig." *Id.* The plaintiff suffered an injury aboard the CAJUN EXPRESS on September 10, 2000, and the vessel was completed in April or May 2001. *Id.*

The court found that the CAJUN EXPRESS was still under construction at the time plaintiff suffered his injury. *Id.* at 299. Even though the craft "was capable of self-propulsion" and had even "run some test pipe, it lacked vital equipment to make it *fully operational* as an oil and gas drilling rig." *Id.* (emphasis added). The court found that, "under established Fifth Circuit precedent, the CAJUN EXPRESS was not a vessel in navigation and [plaintiff] was not a Jones Act seaman." *Id.*

Notably, the Fifth Circuit expressly held that the Supreme Court's *Stewart* decision had no effect on its analysis. *Id.* at 300. The Fifth Circuit read "*Stewart*'s instruction that a craft is a vessel if it is *capable* of marine transportation" as limited to the context of that case. *Id.* The *Cain* court explained that "*Stewart* stressed that the in navigation requirement

18

. . . meant that 'structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time.'" *Id.* (quoting *Stewart*, 543 U.S. at 496). And the Fifth Circuit conversely stated that "a structure may not attain vessel status before it is ever put into 'navigation.'" *Id.*

The *Cain* court found this conclusion—that crafts under construction are not vessels—consistent with policy goals and to prevent oscillation in and out of Jones Act coverage. *Id.* at 301-02. First, shipbuilders often begin construction at one location, then transport the partially finished structure to a different location to complete construction. *Id.* at 302. Depending on their connection to the ship, the land-based shipbuilders working on these "vessels-to-be" could be transformed into Jones Act seamen under *Stewart*'s practically-capable-of-navigation test. *Id.* At least, such cases would require fact-intensive analyses into the relationship between the shipbuilders and the ship, disserving the interest of employers, insurers, and employees in predicting whether the Jones Act will cover them on a given workday. *Id.* at 302 (quoting *Chandris*, 515 U.S. at 363). Second, there are numerous stages of construction where a ship is arguably "practically capable" of transportation, *i.e.*, a vessel under *Stewart*. *Id.* The Fifth Circuit's test draws a bright line, preventing uncertainty in the analysis. *Id.*

Regarding the CAJUN EXPRESS, the Fifth Circuit found that the craft was still under construction because it was not yet fit for duty to serve its intended purpose as a drilling rig. *Id.* at 302-03. Rejecting the application of the *Stewart* test, the court stated that "[i]t strains reason to say that a craft upon the water that is under construction and is not fit for service is practically capable of transportation." *Id.* at 302. Moreover, the CAJUN EXPRESS had not yet received its Coast Guard Certificate of Inspection ("COI"). *Id.* at 302-03. The Court noted that, although lack of a COI is not dispositive for non-vessel status, to hold that the CAJUN EXPRESS was a vessel would mean that a ship that is not legally permitted to operate is "practically, rather than theoretically, capable of transportation." *Id.* at 303 & n.1.

The Court finds that *Cain*'s reasoning applies with equal force to the LOUIS ARMSTRONG which, although not newly constructed, was a vessel undergoing reconstruction and conversion to a different use. The Ninth Circuit reached a similar conclusion in *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d at 571. In *McKinley*, the Ninth Circuit differentiated between cases in which a ship undergoes "mere repair" and those involving "conversion." *Id.* The craft at issue in *McKinley* was a drilling rig hull valued at $451,000 in which the defendant had invested $14,082,000 to convert it

to a seafood processing ship. *Id.* Based on the difference in the value of the hull and the cost of the work, the court found that the case was "more analogous to new construction than repair or overhaul." *Id.* As such, it held that the "pivotal question" was whether the ship "had been placed in commerce *for its intended use*." *Id.* Here, the LOUIS ARMSTRONG was a n0n-vessel floating casino ship for 15 years before NOP purchased it for $395,000.00.[40] NOP has expended $12,943,135.93 to convert the ship into a "music and entertainment venue."[41] Similar to the ship in *McKinley*, the Court finds that the LOUIS ARMSTRONG is analogous to a newly constructed vessel, rather than a vessel undergoing mere repairs. *Id.* at 571.

Moreover, just as *Cain* recognized that applying the "capable of navigation" test in the context of newly constructed vessels raises concerns that a craft may oscillate in and out of navigation, the same is true here with the LOUIS ARMSTRONG. Like a new vessel, the LOUIS ARMSTRONG was moved from location to location at various stages of completion. *Cf. Cain*, 518 F.3d at 303. Additionally, the Fifth Circuit's concern that construction workers aboard vessels-under-construction might be classified as Jones Act

---

[40]   R. Doc. 17-3 at 1, ¶ 3.

[41]   *Id.* at 2, ¶ 8.

seamen is particularly relevant here because plaintiff acknowledged that he came across such workers on a daily basis.[42]  *Cf. id.*

Applying *Cain* here, the Court finds that the LOUIS ARMSTRONG was not a "vessel in navigation."  Defendant's affiants attest that construction aboard the LOUIS ARMSTRONG was ongoing at the time of plaintiff's injury.[43]  Indeed, plaintiff himself admitted at his deposition that he encountered construction workers daily in the course of his job.[44]  The ongoing nature of the construction work indicates that the LOUIS ARMSTRONG was not yet ready to serve its intended purpose as an "entertainment and music venue."[45]  Despite plaintiff's arguments that the LOUIS ARMSTRONG was capable of "push[ing] up or down"[46] the Mississippi River, plaintiff has introduced no evidence showing that the LOUIS ARMSTRONG was actually capable of serving its intended purpose as of September 10, 2019.

Moreover, Keller[47] and Smith[48] attest that, like the CAJUN EXPRESS in *Cain*, the LOUIS ARMSTRONG had not yet received its COI and was

---

[42]    R. Doc. 17-4 at 10 (Dufrene Deposition at 163:1-19).
[43]    R. Doc. 17-2 at 4, ¶ 23; R. Doc. 17-3 at 3, ¶ 13.
[44]    R. Doc. 17-4 at 10 (Dufrene Deposition at 163:1-19).
[45]    R. Doc. 17-3 at 1, ¶ 2.
[46]    R. Doc. 27-1 at 18 (Keller Deposition at 95:8-9).
[47]    R. Doc. 17-2 at 5, ¶ 25.
[48]    R. Doc. 17-3 at 3, ¶ 15.

therefore not legally permitted to operate. *Cf. id.* at 303; *see* 46 U.S.C. § 3311(1) (stating that "a vessel subject to inspection . . . may not be operated without having on board a certificate of inspection"). Because of the ongoing construction work aboard the LOUIS ARMSTRONG, that plaintiff has not shown that the LOUIS ARMSTRONG was yet capable of serving its intended purpose, and the lack of a COI, the Court finds that plaintiff has failed to create an issue of fact as to whether the LOUIS ARMSTRONG was a "vessel in navigation" at the time of his injury. Consequently, the Court finds that plaintiff has failed to create a triable issue of fact on the question of whether he is a seaman. The Court must dismiss plaintiff's claims under the Jones Act and general maritime law.

### B.   LHWCA Claim

The LHWCA covers injuries of workers who meet the Act's "status" and "situs" requirements. *See New Orleans Depot Servs. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 389 (5th Cir. 2013). The "situs" test requires that the injury occur on the "navigable waters of the United States" and "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). The "status" requirement limits application of the LHWCA to

"traditional maritime occupations." *New Orleans Depot Servs.*, 718 F.3d at 389; *see* 33 U.S.C. § 902(3) (defining "employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker" (emphasis added)).

There is no dispute that plaintiff's injury occurred on a covered situs—the Mississippi River.  Nor is there any dispute that plaintiff was "engaged in maritime employment," *i.e.*, was a covered employee under the LHWCA.  *See* 33 U.S.C. § 902(3).  Instead, the dispute in this case surrounds whether plaintiff is entitled to bring a claim for negligence under § 905(b) of the Act. Section 905(b) gives an injured worker a third-party negligence claim against a vessel causing injury.  *Id.* § 905(b).  But § 905(b) excludes injured employees from bringing such negligence claims when they "w[ere] employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner . . . of the vessel." *Id.*

Notably, the exclusion does not apply to all covered workers under the LHWCA.  *Gay v. Barge 266*, 915 F.2d 1007, 1010 (5th Cir. 1990) (Rubin, J.). The bar in § 905(b) applies to the "specific occupations listed: shipbuilders, ship repairers[,] and ship breakers."  *Id.*  Congress did not "foreclose suits by all covered employees against employer-shipowners."  *Id.*  To determine

whether the § 905(b) exclusion applies, a court should not "look only at what the employee was doing at the moment he was injured." *Id.* Instead, to determine whether an employee is a ship repairer, a court must examine two factors: (1) "whether the employee 'regularly performs some portion of what is indisputably [ship-repair] work;'" or (2) whether the employee "has been assigned for an appreciable period of time to do 'substantial [ship-repair] work . . . even though his assignment to it is not 'permanent.'" *Id.* The first element is a "question of applying the law to the facts," and the second is a "pure question of fact." *Id.* at 1011. In *Gay*, the district court found as a matter of law that an employee was a ship repairer where, from "time to time" he "pump[ed] out barges." *Id.* at 1008, 1011. The Fifth Circuit reversed, finding (1) that a reasonable jury could have concluded that pumping out barges was not "repair" work, and (2) that there was no evidence that the plaintiff "regularly" pumped water from barges. *Id.*

NOP argues that plaintiff is a ship repairer because, at his deposition, he admitted that every day he "clean[ed] up some of the mess" that the construction workers made.[49] Under *Gay*, the Court must apply the law to the facts to determine whether plaintiff's cleaning was "indisputably [ship-repair] work." 915 F.2d at 1010-11. The Court notes that some types of

---

[49]   R. Doc. 17-4 at 10 (Dufrene Deposition at 163:1-19).

cleaning may "indisputably" be ship-repair work.  *See* 29 C.F.R. § 1915.4(j) (stating that under regulations promulgated by the Occupational Safety and Health Standards Administration, "ship repair" includes "cleaning").  But the Court cannot say, based on the evidence presented here, that plaintiff's cleaning was "indisputably" ship-repair work.  At plaintiff's deposition, he testified that his work consisted of "[b]asic deckhand jobs," including "[c]leaning, keeping up with the boat, making sure that it was ready for passengers, . . . [that the] life jackets were up to par [and], mak[ing] sure [that the] ropes were tight."[50]  He also states that he did other tasks at Keller's orders, including "maintenance, changing lights, . . . pressure washing [outer decks,] and washing [and] cleaning."[51]  Plaintiff testified that, though he saw the construction workers, he never actually worked with or assisted them.[52]  He did, however, regularly "clean up some of the mess" that the construction workers made."[53]  Significantly, NOP retained separate ship-repair companies, Ryals Commercial Construction and Buck Kreihs, to complete the construction work while the LOUIS ARMSTRONG was docked at the Orange Street Wharf.[54]  Plaintiff was employed by NOP, not one of these

---

[50]   R. Doc. 17-4 at 8 (Dufrene Deposition at 139:16-21).
[51]   *Id.* (Dufrene Deposition at 139:21-24).
[52]   *Id.* at 10 (Dufrene Deposition at 163:1-14).
[53]   *Id.* (Dufrene Deposition at 163:15-19).
[54]   R. Doc. 17-3 at 3, ¶13.

repair companies.[55]  Thus, plaintiff was not part of the regular compliment of workers that the ship repair companies provided to repair and clean the LOUIS ARMSTRONG.  Nor does the evidence show that, although not employed by those companies, he worked under their direction, or spent a significant portion of his time working in tandem with them.  Based on this evidence, the Court finds that a reasonable jury could conclude that plaintiff was not a "ship repairer" under the meaning of 33 U.S.C. § 902(3).  *See Gay*, 915 F.2d at 1011.

In effect, defendant argues that any employee who cleans up after construction workers is *per se* a ship repairer.  Defendant cites no authority that supports its position.  Instead, defendant relies solely on *Ducrepont v. Baton Rouge Marine Enterprises, Inc.*, 666 F. Supp. 882 (E.D. La. 1987), *aff'd*, 877 F.2d 393 (5th Cir. 1989), a non-binding decision.  In *Ducrepont*, the defendant was a shipyard business that engaged in "cleaning, repairing[,] and fleeting barges."  *Id.* at 883.  The plaintiff, one of defendant's employees, was injured while working aboard one of the defendant's barges.  *Id.* at 883-84.  As a supervisor, plaintiff's job included "overseeing the cleaning and repair activities conducted by the defendant."  *Id.*  At the district court, plaintiff argued that § 905(b) creates a distinction between cleaning and

---

[55]      *Id.* at ¶ 14.

repairing services, and that the exclusion for ship repairers did not apply in his capacity a cleaner. *Id.* at 889. The district court rejected this argument, finding that, on the evidence presented, the cleaning services that defendant performed were ancillary to its repair services. *Id.* Thus, the plaintiff could not avoid the § 905(b) bar. *Id.* at 890.

Unlike the defendant in *Ducrepont*, NOP is a riverboat cruise operator, not a shipyard.[56] Although there is some evidence that plaintiff cleaned up after construction workers,[57] plaintiff testified that his job duties included "[b]asic deckhand jobs," none of which was related to the repair work being done by separate companies on the LOUIS ARMSTRONG.[58] *Ducrepont* is distinguishable, and does not alter the Court's conclusion that issues of fact remain as to whether § 905(b) bars plaintiff's negligence claim. The Court must deny defendant's motion for summary judgment on this claim.

### C. Louisiana State Law Negligence Claims

Plaintiff's claims for negligence under Louisiana law are subject to the exclusivity provisions of the LHWCA. Section 905(a) of the LHWCA provides that "[t]he liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to

---

[56]   *See* R. Doc. 17-3 at 1, ¶ 4.
[57]   R. Doc. 17-4 at 10 (Dufrene Deposition at 163:1-19).
[58]   *Id.* at 8-9 (Dufrene Deposition at 139:16-140:4).

the employee." 33 U.S.C. § 905(a).  Because NOP is plaintiff's employer, the LHWCA's remedy is exclusive.  *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (stating that the LHWCA expressly preempts all claims against an employer or a vessel except for those provided under the Act).  The Court must dismiss plaintiff's claims for negligence under Louisiana law.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS defendant's motion IN PART.  Plaintiff's claims under the Jones Act, general maritime law, and Louisiana law are DISMISSED.  As to plaintiff's claims under § 905(b) of the LHWCA, defendant's motion is DENIED.

New Orleans, Louisiana, this __3rd__ day of March, 2021.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE